1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE LOUDEYE CORPORATION
SECURITIES LITIGATION

No. C06-1442MJP

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS AND
GRANTING PLAINTIFFS LEAVE TO
FILE AMENDED COMPLAINT

Plaintiffs have filed a putative class action against Defendant Loudeye Corporation and five of its former employees for alleged violations of federal securities laws.  This matter comes before the Court on Defendants' motion to dismiss Plaintiffs' consolidated amended complaint.  (Dkt. No. 21.) Having reviewed the materials submitted by the parties and the balance of the record, and having heard oral argument, the Court GRANTS Defendants' motion to dismiss.  However, the Court also grants Plaintiffs leave to file an amended complaint, provided that any amended complaint must be filed within 30 days of the date of this order.  The reasons for the Court's order are set forth below.

**Background**

Plaintiffs are seeking to maintain a class action on behalf of purchasers of Loudeye Corporation common stock between May 14, 2003 and November 9, 2005.  Defendants are Loudeye

and five of its former employees: (1) Jeffrey Cavins; (2) Michael Brochu; (3) Jerold Goade; (4) Andrew Bay[1]; and (5) Lawrence Madden.

Plaintiffs' consolidated amended complaint is 101 pages and includes 191 paragraphs. The Court provides a brief background of the case below, although in the interest of brevity the Court will not recite all factual allegations in the 101-page complaint. The Court accepts as true the well-pleaded factual allegations in the complaint. However, as permitted on a motion to dismiss, the Court has also taken judicial notice of documents of public record submitted by the parties.

A.    Events Predating Putative Class Period

Loudeye was founded in 1997 and went public in 2000. The company provided business-to-business digital media services.

On March 11, 2003, Jeffrey Cavins was appointed as Loudeye's new president and CEO. (Defs. Ex. 17 at 1304.) As an exhibit to their complaint, Plaintiffs have attached a resume that Mr. Cavins apparently created after he left Loudeye in 2005. The resume states that Mr. Cavins' objective as Loudeye's CEO was to "turn around a failing business" and that "[w]hen I arrived, the company had $8M in cash on hand, was burning $6.5M per quarter, had $13M in long term lease obligations, was being delisted from NASDAQ, had no strategy, producing $2.7M in quarterly revenue with negative gross margins, very low employee morale and was experiencing rapid customer flight."

On March 14, 2003, Loudeye announced a restructuring initiative. Materials filed with the SEC indicate that Loudeye announced a reduction in staff affecting approximately 35% of its workforce. (Defs. Ex. 17 at 1306.) Loudeye also announced a "corporate strategy to tighten its focus on its core competencies in digital media services" and indicated that the company had "identified areas for lowering our cost structure as we execute this corporate strategy." Id.

_____

[1] Although Plaintiffs identify "Andrew Bay" as the chairman of Loudeye during the putative class period (Complaint ¶ 11), it appears from public documents that Mr. Bay's first name is Anthony. See, e.g., Defs. Ex. 13 at 917.

B.    <u>May 14, 2003: Beginning of Putative Class Period</u>

The putative class period begins on May 14, 2003.  On that day, Loudeye announced its first quarter results for 2003.  The company issued a press release that quoted Mr. Cavins as stating, among other things, that Loudeye had "implemented an aggressive restructuring plan which has already resulted in significant cost savings" and that "[w]e are encouraged by our progress, as we took steps to reduce our cost structure, reduce cash burn and tightly focus our business to deliver better financial results in future quarters." (Complaint ¶ 31; Defs. Ex. 23 at 1361.)

C.    <u>March 2004: Overpeer Acquisition</u>

In March 2004, Loudeye announced that it would acquire Overpeer, Inc., a company that produced software intended to thwart illegal file sharing.  Plaintiffs allege that the Overpeer acquisition was a "colossal disaster and complete legal and technological liability" and that Defendants "knew during the Class Period they could not successfully integrate Overpeer's technical platforms with its own." (Complaint ¶ 48.)

D.    <u>June 2004:  OD2 Acquisition</u>

On June 21, 2004, Loudeye announced that it had acquired On Demand Distribution, Ltd. ("OD2"), a European digital music provider.  Loudeye issued a press release that day stating that the acquisition "creates the largest business-to-business focused digital media company in the world." (Complaint ¶ 99.)   Plaintiffs allege that Defendants were never able to integrate OD2 into the company.  <u>Id.</u> ¶¶ 47.

E.    <u>Throughout 2004:  Accounting Problems</u>

Much of Plaintiffs' complaint focuses on allegations regarding accounting problems, particularly during 2004.

1.    <u>PwC Resignation in June 2004</u>

On June 30, 2004, PricewaterhouseCoopers (PwC) notified Loudeye that it would resign as the company's independent auditor after completing its review of Loudeye's interim financial

ORDER - 3

statements for the second quarter of 2004.  Loudeye announced the resignation in a press release on

July 8, 2004.  (Complaint ¶ 103-4; Defs. Ex. 37 at 1424.)  In the press release, Loudeye indicated that

it had expected to terminate its relationship with PwC based on the results of a company-initiated

evaluation process that commenced in April and stated that "PWC's resignation was not the result of

any disagreement between PWC and Loudeye on any matter of accounting principles, financial

statement disclosures, or auditing scope or procedures."  Id.  Moss Adams LLP succeeded PwC as

the company's independent accounting firm.

     2.   <u>Restructuring and Turnover in Accounting Department</u>

Plaintiffs' complaint alleges that Loudeye experienced complete turnover in its accounting

department during the class period through terminations and/or resignations.  (Complaint ¶ 50.)

Among other things, the complaint cites language from Loudeye's second quarter 2004 10-Q filing

with the SEC, which discussed turnover in the accounting department:

> In May 2004, based on an evaluation of our existing accounting resources, management
> developed a plan to restructure the accounting and financial reporting function.  This plan
> includes both the addition of new resources and the replacement of certain existing resources.
> At that time, we began recruiting efforts for various positions within our accounting
> department.  In July 2004, and after details of the restructuring plan became known to
> members of our accounting staff, four individuals in our accounting department announced
> their intention to leave.  Three of these individuals have agreed to remain with Loudeye in their
> current capacity through September 30, 2004, and we may negotiate longer periods with one
> or more of these individuals.  We are continuing the recruitment process to hire appropriate
> replacements.

(Complaint ¶ 110.)

     3.   <u>Announcements of Deficiencies in Internal Controls</u>

In its August 2004 10-Q filing with the SEC for the second quarter of 2004, Loudeye

disclosed that PwC had identified two "material weaknesses" in its internal control over financial

reporting.

> *    Insufficiently skilled personnel compounded by a lack of human resources and expected
> near-term significant turnover within the company's accounting and financial reporting
> function.  Also, we must improve controls surrounding adequate monitoring and
> oversight of the work performed by accounting and financial reporting personnel; and

      *      Insufficient analysis, documentation and review of the selection and application of generally accepted accounting principles (GAAP) to significant non-routine transactions, including the preparation of financial statement disclosures relating thereto.

(Defs. Ex. 8 at 432.)

In its 10-K filing with the SEC for the year ended December 31, 2004, Loudeye disclosed that its principal executive and principal financial officers had concluded that the company's "disclosure controls and procedures were not effective due to the material weaknesses in our internal control over financial reporting as of December 31, 2004." (Complaint ¶ 126; Defs. Ex. 10 at 695.) The filing also indicated that "[m]anagement has assessed these deficiencies and determined that there were eight material weaknesses in Loudeye's internal control over financial reporting." (Complaint ¶ 128; Defs. Ex. 10 at 699.) The filing contains a lengthy assessment of Loudeye's accounting deficiencies and a description of various adjustments that had been made.

F.     February 2005 Change in Leadership

On February 1, 2005, Loudeye issued a press release announcing that it had hired Defendant Michael Brochu as its new President and CEO, following the departure of Defendant Cavins. (Complaint ¶ 119; Defs. Ex. 41.)

G.     November 9, 2005: End of Putative Class Period

The putative class period ends on November 9, 2005. On that day, Loudeye issued a press release announcing its third quarter results. Loudeye revealed that its losses were up to $8.5 million and that its revenue was $6.8 million, below analysts' estimates of $8 million. (Complaint ¶ 133.) The next day, Loudeye shares dropped from $7.70 to $4.80 per share. Id. ¶ 134.

H.     Events After Putative Class Period

After the end of the putative class period on November 9, 2005, Loudeye ceased to be an independent company within a year. Key events include:

      *      December 9, 2005:     Loudeye announced that Overpeer had ceased operations.

| | | |
|---|---|---|
| * | March 2006: | Loudeye announced that its 2005 10-K form contained a "going concern" qualification indicating that the cash flows generated by the company were not sufficient to support its operations in the near term. |
| * | May 1, 2006: | Loudeye announced that it had sold its US operations to a company called Muze for $11 million. |
| * | August 8, 2006: | Loudeye announced that it was selling the remainder of the company to Nokia for about $60 million. |

### Analysis

Plaintiffs have brought claims under Section 10(b) of the Securities Exchange Act of 1934, which prohibits the "use or employ, in connection with the purchase or sale of any security . . . , [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange] Commission may prescribe . . . ." 15 U.S.C. § 78j(b). In turn, SEC Rule 10b-5 implements § 10(b) by making it unlawful:

(a)    To employ any device, scheme, or artifice to defraud;

(b)    To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading; or

(c)    To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Plaintiffs also bring claims under Section 20(a) of the Exchange Act, which makes "control persons" liable for securities violations committed persons under their control. 15 U.S.C. § 78t(a). To maintain a claim under Section 20(a), however, Plaintiffs must plead a viable primary claim under Section 10(b). See, e.g., Rubke v. Capitol Bancorp, 2006 WL 1699569 at *18 (N.D. Cal. June 16, 2006) ("Adequate pleading of a primary violation of § 10(b) is required for a plaintiff to adequately plead control liability under § 20(a).").

In their opposition brief, Plaintiffs summarize their theory of this case as follows:

Rather than acknowledging to the market that the Company's strategy was an abject failure, Defendants instead engaged in a fraudulent scheme to artificially inflate the price of Company stock. Plaintiffs have alleged that defendants' scheme enabled defendants to: (i) deceive class members regarding the intrinsic value of Company stock and cause them to purchase Loudeye at artificially-inflated prices; (ii) raise almost $60M through Private Investment in Public Equity Stock Sales ("PIPE" Sales) to private investors during the Class Period; (iii) use almost $25 million of Loudeye's artificially-inflated shares to purchase the once-valuable assets of companies such as Overpeer and OD2. When it became clear to Defendants that they would be unable to salvage the Company, they continued their scheme to artificially inflate the price of Loudeye stock with a different goal in mind: to save themselves by selling the Company's assets and obtaining lucrative deals for themselves.

(Opp. at 4) (internal citations omitted).

Defendants have moved to dismiss Plaintiffs' consolidated amended complaint, arguing that the complaint is subject to dismissal for two independent reasons: (1) failure to allege sufficient facts to give rise to a strong inference that Defendants acted with scienter, as required by the Private Securities Litigation Reform Act (PSLRA); and (2) failure to meet the PSLRA's heightened standards for pleading actionable misstatements. The Court considers each argument below.

A.      Scienter

To prevail on a Section 10(b) claim, a plaintiff "must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2507 (2007). The PSLRA requires a plaintiff who alleges that a defendant made a false or misleading statement to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

1.      *Tellabs* Decision

In Tellabs, Inc. v. Makor Issue & Rights, Ltd., 127 S. Ct. 2499 (2007), the Supreme Court recently addressed the scienter pleading requirements of the PSLRA. The Court held "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Id. at 2509. Although the Court noted that the scienter inference "need not be irrefutable" or "even the most plausible of competing inferences," it held that "the inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and

compelling, thus strong in light of other explanations." Id. at 2510.  The Court summarized that "[a]

complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and

at least as compelling as any opposing inference one could draw from the facts alleged." Id.

The Court indicated that to determine whether there is a strong inference of scienter, "the

court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."

Id. at 2511.  The Court stated that "the reviewing court must ask: When the allegations are accepted

as true and taken collectively, would a reasonable person deem the inference of scienter at least as

strong as any opposing inference?" Id.

2. Plaintiffs' Allegations

In response to Defendants' motion, Plaintiffs argue that when taken together, their "myriad

scienter allegation present a compelling picture of deliberate recklessness and/or actual knowledge that

the statements made and facts concealed by Defendants during the Class Period were materially false

and misleading when made or concealed."  (Opp. at 5.)  Plaintiffs list the following eight types of

allegations to support their scienter arguments:

a. Lack of Internal Controls:  Plaintiffs note that there was complete turnover in

Loudeye's accounting department during the class period.  Plaintiffs argue that Defendants

"terminated virtually the entire accounting department, ensuring that trained accounting personal

would NOT oversee the Company's financial statements and ensuring that there were inadequate

controls over financial reporting, further enabling the fraud."  (Opp. at 5) (emphasis in original).

b. Alleged Admissions by Defendants that Financial Statements Failed to Comply

With GAAP and SEC:  Plaintiffs point to the fact that Defendants "*admitted* that management's

assessment was that 'internal control over financial reporting [and] *financial reporting was not*

*effective as of December 31, 2004*."  (Opp. at 6) (emphasis in original).  Plaintiffs assert that this

concession alone demonstrates that Loudeye's financial statements were not true, accurate, or reliable,

at least during the latter portion of the class period.  Plaintiffs also note that Loudeye admitted errors

1   in accounting that required a series of "entries and adjustments."  In addition, Plaintiffs point to

2   allegations in their complaint regarding various internal control deficiencies at Loudeye, as well as

3   their allegations that Defendants "materially overstated the company's profitability by underreporting

4   Loudeye's true financial and operational costs and expenses during the Class Period."  (Opp. at 6-7.)

5           c.     Resignation of PwC and Termination of Accounting Department:  Plaintiffs

6   next assert that a strong inference of scienter may be drawn based on PwC's resignation and the

7   resignation of Interim CFO Jerold Goade.  (Opp. at 7.)  Plaintiffs also repeat their allegations of

8   scienter based on the "firing/resignations of virtually the entire accounting department."  Id.

9           d.     Defendant Cavins' Resume:  Plaintiffs also suggest that the resume of

10  Loudeye's former CEO Jeffrey Cavins provides an "important indicia of Defendants' scienter."  (Opp.

11  at 9.)  Mr. Cavins was hired as Loudeye's CEO in March 2003, shortly before the beginning of the

12  class period.  In a resume that he apparently prepared after leaving Loudeye in 2005, he stated

13  "[w]hen I arrived, the company had $8M in cash on hand, was burning $6.5M per quarter, had $13M

14  in long term lease obligations, was being delisted from NASDAQ, had no strategy, producing $2.7M

15  in quarterly revenue with negative gross margins, very low employee morale and was experiencing

16  rapid customer flight."  Plaintiffs suggest that this negative assessment of the company in his resume is

17  inconsistent with his later statements that presented more optimistic views about the company.

18          e.     Sarbanes-Oxley Certifications:  Plaintiffs also assert that "Defendants'

19  execution of numerous Sarbanes-Oxley certifications during the Class Period – attesting that the

20  various false and misleading reports 'fairly present[], in all material respects the financial condition and

21  results of operations of the Company' support a strong inference of scienter."  (Opp. at 9.)

22          f.     Allegations Based on Statements From Former Employees:  Plaintiffs claim that

23  their "allegations based on discussions with former employees support a strong inference of scienter

24  here, where specific details are included."  (Opp. at 10.)  Plaintiffs note that their complaint includes

25  the names of particular members of the accounting department, the software they used, and allegations

ORDER - 9

1   that they could not succeed because of a "legacy of corruption" that they had inherited and the

2   "unethical" management at the helm." Id.

3           g.      PIPE Sales: Plaintiffs also suggest that "Private Investment in Public Equity

4   Stock Sales" (PIPE sales) made by Loudeye during the class period support a strong inference of

5   scienter.  Plaintiffs state:

> The Complaint alleges that by artificially inflating the price of Loudeye stock, Defendants were
> able to raise $60M of much needed cash through [PIPE sales].  In recent years, the use of
> PIPES to obtain equity capital to finance growth, acquisitions, or obtain working capital has
> increased in popularity.  Here, where Defendants were in desperate need of a cash infusion
> without a high level of due diligence that would uncover the fraudulent scheme, PIPES were
> an obvious solution.  In order to make PIPE transactions possible, Defendants continued to
> issue false and misleading statements to attract the interest of private investors.

10  (Opp. at 11) (internal citations omitted).

11          h.      Defendants' "Numerous Acquisitions and Sweetheart Deals with Nokia":

12  Finally, Plaintiffs contend that scienter may be inferred because: (1) Defendants allegedly used

13  artificially-inflated stock to buy Overpeer and OD2; (2) when Defendants were unable to salvage the

14  company, Defendants "saved themselves" by selling the company to Nokia in a deal that included

15  complete indemnification for Defendants; and (3) Defendant Michael Brochu, Loudeye's CEO at the

16  time of the Nokia sale, "pocketed hundreds of thousands of dollars in the Nokia deal."  (Opp. at 11.)

17          3.      Considering Plaintiffs' Allegations Collectively

18          In Tellabs, the Supreme Court held that allegations of scienter must be considered

19  "holistically" and "collectively."  Tellabs, 127 S. Ct. at 2511.  Having considered Plaintiffs' allegations

20  as a whole, the Court finds that Plaintiffs have not sufficiently alleged facts giving rise to a strong

21  inference that any of the Defendants acted with scienter.

22          First, Plaintiffs point to problems in Loudeye's accounting department, including allegations

23  there was complete turnover in Loudeye's accounting department during the class period.  However,

24  Defendants disclosed the turnover in the department in their SEC filings and identified turnover as a

25  material weakness in Loudeye's internal control.  These disclosures tend to negate any inference that

ORDER - 10

1   Defendants used the turnover as a means of concealing or "enabling fraud," as Plaintiffs appear to

2   suggest. Defendants also promptly disclosed that PwC had resigned as its auditor, and Plaintiffs have

3   not alleged facts suggesting that PwC's resignation was due to fraud committed by Defendants.

4          Similarly, allegations that Defendants had deficient internal controls during the class period

5   does not create a strong inference that Defendants knowingly making false or misleading statements.

6   As Judge Robart of this Court has observed, "[t]hat the controls were inadequate is perhaps an

7   indication of incompetence, but incompetence, even gross incompetence, is no basis for a securities

8   fraud claim." See In re Watchguard Sec. Litig., 2006 WL 2927663 at * 10 (W.D. Wash. Oct. 12,

9   2006).

10         Plaintiffs also suggest that their allegations that Defendants failed to comply with generally

11   accepted accounting principles (GAAP) supports a strong inference of fraud. The Ninth Circuit has

12   held that "significant violations of GAAP standards can provide evidence of scienter," but only "so

13   long as they are pled with particularity." In re Daou Sys. Sec. Litig., 411 F.3d 1006, 1022 (9th Cir.

14   2005). Here, however, Plaintiffs have alleged GAAP violations in vague terms. As Defendants

15   suggest, Plaintiffs provide little if any specific explanation as to how the alleged GAAP violations

16   affected Loudeye's financial statements.

17         Plaintiffs also suggest that Defendants' Sarbanes-Oxley certifications serve to support a strong

18   inference of scienter. As Defendants note, a number of courts have rejected arguments that a strong

19   inference of scienter arises from a Sarbanes-Oxley certification that later proves to be inaccurate. See,

20   e.g., Watchguard, 2006 WL 2927663 at * 10; Limantour v. Cray, Inc., 432 F. Supp.2d 1129, 1160-61

21   (W.D. Wash. 2006). Even if Defendants' Sarbanes-Oxley certifications later proved to be incorrect,

22   that does not create a strong inference that Defendants knew such certifications were false or

23   misleading at the time they were made.

24         Plaintiffs' reliance on Mr. Cavins' resume from 2005 is also unpersuasive evidence of scienter.

25   Mr. Cavins' 2005 resume contains a negative assessment of the company before he took over as CEO

1   on March 11, 2003.  As Defendants note, it was no secret that Loudeye was a struggling company

2   when Mr. Cavins became CEO in March 2003.  Indeed, the company's 10-K filing for 2002 and its

3   10-Q filing for the first quarter for 2003 both included "going concern" statements that publicly

4   expressed "substantial doubt about [Loudeye's] ability to continue as a going concern."  (Defs. Ex. 2

5   at 53 and Ex. 3 at 131.)  Plaintiffs suggest that Mr. Cavins' negative assessment of the company

6   before he took over as CEO stands in stark contrast to more optimistic statements he later made, such

7   as a May 14, 2003 press release where he stated that "[i]n the first quarter we achieved improved sales

8   bookings and billings and implemented an aggressive restructuring plan which has already resulted in

9   significant cost savings . . . .  We are encouraged by our progress, as we took steps to reduce our cost

10  structure, reduce cash burn and tightly focus our business to deliver better financial results in future

11  quarter."  However, Mr. Cavins' May 14th statements simply appear to reflect his views regarding

12  progress the company had made after he assumed the role of CEO on March 11th.  The fact that Mr.

13  Cavins had a negative assessment of the state of the company before he became CEO does not fairly

14  suggest that his later statements regarding the company's progress under his leadership were

15  knowingly false or misleading.

16        Plaintiffs' allegations based on statements by former employees also provide scant support for

17  inferring scienter.  Simply because Plaintiffs' complaint includes the names of accounting department

18  members, identifies the software they used, and contains vague allegations of a "legacy of corruption"

19  and "unethical management" does not suggest that any Defendants knowingly made any particular

20  false or misleading statements.  Similarly, Plaintiffs' suggestion that Loudeye's "PIPE sales" support

21  an inference of scienter is not persuasive.  As Defendants note, every company wants to attract

22  investments, and if the desire to raise capital were sufficient to help support a strong inference of

23  scienter, the PSLRA's pleading requirement have little force.  Finally, Plaintiffs' allegations regarding

24  Loudeye's acquisitions of Overpeer and OD2 and the so-called "sweetheart deals" with Nokia add

25

1    little basis for inferring scienter.  In particular, the Nokia deal occurred after the putative class period

2    and sheds no light on Defendants' state of mind during the putative class period.

3            Taken as a whole and viewed collectively, Plaintiffs' allegations may create an inference that

4    Defendants made unwise business and management decisions, but they do not give rise to a strong

5    inference of "a mental state embracing intent to deceive, manipulate, or defraud'" by any of the

6    Defendants.  <u>Tellabs</u>, 127 S. Ct. at 2507.  Therefore, the Court finds that Plaintiffs' consolidated

7    amended complaint is subject to dismissal because it fails to state with particularity facts giving rise to

8    a strong inference that Defendants acted with scienter, as required by the PSLRA.

9    B.     <u>Adequacy of Allegations Regarding Materially False and Misleading Statements</u>

10           Defendants also argue that Plaintiffs' complaint is subject to dismissal for failing to adequately

11   allege actionable misstatements.  It is not necessary to reach this alternative basis for dismissal in light

12   of the Court's holding that Plaintiffs' complaint is subject to dismissal for failure to allege sufficient

13   facts to give rise to a strong inference of scienter.  However, in the interest of providing additional

14   guidance to Plaintiffs if they choose to submit an amended complaint, the Court addresses Defendants'

15   second argument briefly below.

16           Securities fraud claims are subject to the heightened pleading standards of both Fed. R. Civ. P.

17   9(b) and the PSLRA.  Rule 9(b) requires averments of fraud to be pleaded with particularity, including

18   the dates, times, place, and persons associated with each misrepresentation or act of fraud.  <u>In re</u>

19   <u>GlenFed, Inc. Sec. Litig.</u>, 42 F.3d 1541, 1547-48 n.7 (9th Cir. 1994).  In addition, the PSLRA requires

20   a complaint to "specify each statement alleged to have been misleading, the reason or reasons why the

21   statement is misleading, and, if an allegation regarding the statement or omission is made on

22   information and belief, the complaint shall state with particularity all facts on which that belief is

23   formed."[2]  15 U.S.C. § 78u-4(b)(1).

24   _____

25           [2]  As Defendants note, the PSLRA also includes certain "safe harbor" provisions for "forward-
     looking statements" (e.g., statements that discuss projections, plans and objectives for future

1     In this case, Plaintiffs' consolidated amended complaint is not a model of how to meet the

2     heightened pleading requirements of the PSLRA or Rule 9(b).  The 101-page complaint is repetitive,

3     includes long excerpts from company SEC filings and press releases without clearly identifying which

4     portions of the statements are supposedly false or misleading, and frequently cross-references other

5     paragraphs in the complaint in a manner that makes the document very difficult to follow.  With

6     justification, Defendants characterize the complaint as "puzzle-like" and note that other courts have

7     dismissed similarly confusing securities fraud complaints.  See, e.g., In re Dot Hill Sys. Corp. Sec.

8     Litig., 2007 WL 935469 (S.D. Cal. Mar. 15, 2007).  However, Plaintiffs have attempted in their

9     opposition brief to identify more narrow and specific categories of alleged misstatements, each of

10    which is addressed below.

11        1.    Alleged Understatements of Costs

12        First, Plaintiffs argue that they have adequately alleged that Defendants understated

13    restructuring costs.  Plaintiffs claim that "Defendants' statements relating to the corporate

14    restructuring were false when made because the announced corporate restructuring was not reducing

15    the Company's cost structure and placed additional pressure on the Company's internal control."

16    (Opp. at 19.)  As Defendants note, this contention is amorphous and woefully short of specifics.  In

17    their complaint, Plaintiffs repeatedly allege that Defendants' restructuring was "not proceeding

18    according to plan," but they fail to identify with detail how the restructuring was allegedly failing.

19    Unless Plaintiffs can offer more specific allegations to show why Defendants' statements about

20    corporate restructuring and cost reductions were false when made, they cannot satisfy the PSLRA's

21    pleading requirements.

22

23

24    ─────────────────────

25    operations, future economic performance, or the assumptions underlying or related to any of these
      issues). 15 U.S.C. 78u-5(c)

1          2.        Statements Regarding "Phantom Deals"/Revenue Recognition

2          Plaintiffs also allege that Defendants made misleading statements about "phantom deals" that

3     allegedly had little if any value to the company.  Plaintiffs specifically identify two supposed "phantom

4     deals" in the complaint (one with Starbucks, the other with Gibson Audio), but offer virtually no detail

5     about the deals themselves.  Plaintiffs do not allege that Defendants misrepresented the terms of these

6     deals, but instead suggest that statements regarding these deals were misleading because they were

7     used to "increase interest in the company."  (Opp. at 20).

8          Plaintiffs' allegations regarding these so-called "phantom deals" fails to meet the pleading

9     requirements of the PSLRA.  Companies routinely issue press releases for the purpose of "increasing

10    interest in the company."  Without more specific allegations that the press releases misrepresented the

11    terms of a particular deal, the Court sees no basis for Plaintiffs to assert that such statements are

12    actionable under the PSLRA.

13         Plaintiffs also allege that former CEO Jeff Cavins "sold material that the Company did not have

14    the rights to sell."  (Opp. at 20.)  However, Plaintiffs fail to identify in their complaint what materials

15    Mr. Cavins allegedly sold or when he supposedly sold it, which are basic fraud pleading requirements

16    under Rule 9(b).

17         3.        Acquisitions of Overpeer and OD2

18         Plaintiffs also suggest that Defendants made false or misleading statements regarding Overpeer

19    and OD2, two companies Loudeye acquired in 2004.  Plaintiffs suggest that Loudeye touted these

20    acquisitions despite knowing that they would not be successful additions to the company.

21         Plaintiffs' allegations regarding Overpeer are based in large part on a PC World article from

22    December 2004 that included criticisms of the product.  As Defendants note, however, Plaintiffs do

23    not point to any statements where Loudeye misstated Overpeer's revenues, falsely reported an

24    Overpeer contract, or told the investing public that Overpeer did anything other than what it actually

25    did.  Even assuming that Overpeer was a "colossal disaster and complete legal and technological

1   liability," as Plaintiffs contend, Plaintiffs have not offered sufficient allegations as to why particular

2   statements that Defendants made about Overpeer were false or misleading when made.

3        Plaintiffs' allegations about OD2 are similarly deficient.  Plaintiffs claim that the complaint

4   "adequately alleged that OD2 was problematic from the start and never had any shot at being

5   successfully integrated," yet Defendants "repeatedly touted the successful integration of OD2 from the

6   moment that the acquisition was announced, until the end of the Class Period."  (Opp. at 22.)

7   However, in their complaint Plaintiffs do not specifically identify any public statements made by

8   Loudeye that "touted the successful integration of OD2."  In fact, as Defendants note, the materials

9   referenced in Plaintiffs' complaint include a number of cautionary statements from Loudeye about its

10  ability to integrate OD2.

11       4.   Accounting Issues

12       Finally, Plaintiffs suggest that Defendants must have made materially false or misleading

13  statements regarding their financial statements because Loudeye acknowledged in its 2004 year-end

14  report that "internal control over financial reporting [and] ***financial reporting was not effective as of***

15  ***December 31, 2004***."  (Opp. at 22) (emphasis in original).  Plaintiffs also note that Loudeye admitted

16  during the class period that it had to reclassify certain expenses incurred in 2002 and 2003.

17       In response, Defendants assert that Plaintiffs have not alleged a single specific false entry in

18  Loudeye's books.  Defendants also note that a company with weak internal controls may have

19  accurate financial statements.  Defendants also contend that the "reclassification" of certain expenses

20  had no impact on Loudeye's net loss, stockholder's equity, or cash flow and that it was not necessary

21  to restate Loudeye's financial statements.  Defendants assert that Plaintiffs cannot show how such

22  technical reclassifications could have misled anyone.

23       There is no question that Plaintiffs allege a number of accounting problems.  However,

24  Plaintiffs have not alleged with sufficient particularity how these problems resulted in financial

25

misstatements that would rise to the level of a Section 10(b) violation.  Plaintiffs fail to demonstrate how technical accounting errors may be regarded securities fraud.

        5.     <u>Summary</u>

        The Court agrees with Defendants that Plaintiffs' consolidated amended complaint, to the extent it is comprehensible, fails to allege actionable misstatements with the particularity required by the PSLRA.

C.    <u>Leave to Amend</u>

        Defendants ask the Court to dismiss the complaint with prejudice and without leave to amend. Plaintiffs have requested leave to amend in the event that the Court grants Defendants' motion to dismiss.

        In the context of the PSLRA, the Ninth Circuit has repeatedly emphasized that leave to amend should be granted unless the court determines that the pleading "could not possibly be cured by the allegation of other facts." <u>In re Read-Rite Corp. Sec. Litig.</u>, 335 F.3d 843, 845 (9th Cir. 2003).  The Ninth Circuit has indicated that "[a]dherence to these principles is especially important in the context of the PSLRA," given the difficult pleading standards of the statute.  <u>Eminence Capital, LLC v. Aspeon, Inc.</u>, 316 F.3d 1048, 1052 (9th Cir. 2003).  However, leave to amend need not be granted when amendment would be futile.  <u>Gompper v. VISX, Inc.</u>, 298 F.3d 893, 898 (9th Cir. 2002).

        Although the Court has doubts about Plaintiffs' ability to cure the defects in their complaint in an amended pleading, the Court cannot say with reasonable certainty that amendment would be futile at this point.  Therefore, the Court will grant Plaintiffs' request for leave to file an amended complaint. However, any amended complaint must be filed within <u>30 days</u> of the date of this order.  Failure to comply with the Court's order may result in dismissal of this action with prejudice.  The Court strongly encourages Plaintiffs to draft any amended complaint with significantly greater economy and clarity than their consolidated amended complaint.

ORDER - 17

1

**Conclusion**

2          Plaintiffs' complaint fails to allege sufficient facts to give rise to a strong inference that

3   Defendants acted with scienter.  Plaintiffs' complaint also fails to allege actionable misstatements with

4   the particularity required by the PSLRA.  Therefore, the Court GRANTS Defendants' motion to

5   dismiss Plaintiffs' consolidated amended complaint.  The Court grants Plaintiffs leave to file an

6   amended complaint, provided that any amended complaint must be filed within <u>30 days</u> of the date of

7   this order.

8          The Clerk is directed to send copies of this order to all counsel of record.

9          Dated: August 17, 2007.

10

11                                                          s/Marsha J. Pechman
                                                            Marsha J. Pechman
12                                                          United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

ORDER - 18